# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **LATRENT REDRICK** and **JAMON PRUIETT**, | Case No. 5:18 CV 02523 |
| Plaintiffs, | Judge John R. Adams |
| -vs- | |
| **CITY OF AKRON, et al.**, | |
| Defendants. | |

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Sarah Gelsomino (0084340)
Jacqueline Greene (0092733)
Marcus Sidoti (0077476)
Terry H. Gilbert (0021948)
FRIEDMAN & GILBERT
55 Public Square, Suite 1055
Cleveland, OH 44113-1901
T: (216) 241-1430
F: (216) 621-0427
sgelsomino@f-glaw.com
jgreene@f-glaw.com
marcus@jordansidoti.com
tgilbert@f-glaw.com

Sydney S. Saffold (0093974)
SAFFOLD LAW, LLC
1220 West 6th Street, Suite 303
Cleveland, Ohio 44113
T: (216) 622-2700
F: (216) 622-2714
sydneysaffold@gmail.com

Dated: December 20, 2019                    *Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 1

I.  Events of October 1, 2017 ....................................................................................... 1

   A.  Menacing Men Looking for a Fight on Akron Streets Threaten Redrick, Pruiett, and
      their Friends. ...................................................................................................... 1

   B.  Redrick Attempts to Deescalate the Situation in Line with his CCW Training, but
      Never Raises or Points His Gun. ....................................................................... 3

   C.  Turnure's Account of Redrick's Conduct Prior to the Shooting Contradicts Redrick,
      Pruiett, Brantley, and Fellow Officer Al Jones. ............................................... 5

   D.  Turnure Shoots Redrick and Pruiett without Justification. ............................. 6

   E.  Redrick and Pruiett Have Emergency Trauma Surgery and Akron Police Officers
      Interrogate and Arrest Pruiett at the Hospital. ............................................... 10

   F.  Redrick and Pruiett Are Charged with Crimes Arising from Turnure's Use of Deadly
      Force against Them, Face Prosecution for Months, and Are Subjected to a Criminal
      Trial. ................................................................................................................ 10

II.  Turnure Caused Permanent Injury to Redrick and Pruiett. ................................... 12

III.  Ohio Gun Laws and Redrick's License Allow for Concealed Carrying and Open Carrying
    of a Firearm. .......................................................................................................... 12

IV.  Turnure's Conduct Violated Well-Established Law Enforcement Standards. ................... 12

LAW AND ARGUMENT .................................................................................................. 13

I.  Summary Judgment Standard ................................................................................. 13

II.  Plaintiffs' Constitutional Claim against Turnure Must Proceed to Trial. ........................ 13

   A.  Turnure Violated Redrick's and Pruiett's Constitutional Rights. ............................. 14

      1.  Analysis of Deadly Force at Summary Judgment .................................... 14

      2.  Turnure's Justification for Using Deadly Force against Redrick and Pruitt Is
         Based on Disputed Material Facts. ........................................................ 16

         a.  The Facts, Taken in Redrick's Favor, Establish that Turnure's Use of Deadly
            Force against Him Was Unconstitutional. ..................................... 17

         b.  The Facts, Taken in Pruiett's Favor, Establish that Turnure's Use of Deadly
            Force against Him Was Unconstitutional. ..................................... 19

   B.  Redrick's and Pruiett's Right to Be Free from Excessive Force Was Clearly
      Established on the Date Turnure Shot Them. ................................................... 21

III.  Plaintiffs' State Law Claims Against Turnure Must Proceed to Trial. ............................... 24

IV.  Plaintiffs' Demand for Punitive Damages Survives Summary Judgment. ........................ 25

**CONCLUSION** ......................................................................................................................... **25**

**CERTIFICATE OF COMPLIANCE** ...................................................................................... **26**

**CERTIFICATE OF SERVICE** ............................................................................................... **26**

# TABLE OF AUTHORITIES

**CASES**                                                                   **PAGES**

*Anderson v. Creighton*, 483 U.S. 635 (1987) ……………………..…………………....….. 23

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986) ……………………………….…….. 13

*Anderson v. Massillon*, 134 Ohio St.3d. 380, 983 N.E. 2nd 266 (2012) …………………….. 24

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ……………………..……………………….. 23

*Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015) ……………………..……………………. 23

*Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011) …………………………………………... 21

*Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989) ……………………..……………….…… 15

*Botto v. Fischesser*, 174 Ohio St. 322 (1963) ……………………..……………………….. 25

*Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007) ……………………..……………....…. 22

*Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013) ……………………..……………………... 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ……………………..………………....….. 13

*Chappell v. City of Cleveland,* 585 F.3d 901 (6th Cir. 2009) …………………………... 14, 23, 24

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006) …………………………………….…… 14, 21

*Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996) ……………………..……………….. 22

*Dorr v. City of Ecorse*, 305 F. App'x 270 (6th Cir. 2008) ……………………..………………. 25

*Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) ……………………..…………….... 16

*Graham v. Connor*, 490 U.S. 386 (1989) ……………………..………………………….... 14, 15, 16

*Hensley v. Price*, 876 F.3d 573 (4th Cir. 2017) ……………………..……………..…..…..…. 15

*Hill v. Marshall,* 962 F.2d 1209 (6th Cir. 1992) ……………………..……………..…..…. 25

*Hope v. Pelzer*, 536 U.S. 730 (2002) ……………………..……………………..…………….. 23

*Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2010) ……………………..……………..……….... 16

*Jones v. Sandusky*, 541 Fed. Appx. 653 (6th Cir. 2013) …………………….….….…..….…... 21

*King v. Taylor*, 694 F.3d 650 (6th Cir. 2012) …………………..…………………….....…... 22

*Lemmon v. City of Akron*, 768 Fed.Appx. 410 (6th Cir. 2019) ………………….……..…... 23

*Mullenix v. Luna*, 136 S.Ct. 305 (2015) ………………..……………………….…..…... 22

*Pearson v. Callahan*, 555 U.S. 223 (2009) …………………………………………….…... 13

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) …………………….…….….…….…..……... 21

*Poe v. Haydon*, 853 F.2d 418 (6th Cir. 1988) ……………….….……………………..…... 16

*Pollard v. City of Columbus*, 780 F.3d 395 (6th Cir. 2015) ………………….…..…….…... 23, 24

*Reynolds v. Oakwood*, 38 Ohio App.3d 125 (Ohio Ct. App. 1987) ………………………... 25

*Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005) ……………….……………………..…... 14

*Saucier v. Katz*, 533 U.S. 194 (2001) …………………………………….…..….... 13, 16, 21

*Sherrod v. Williams*, No. 3:14-cv-454, 2019 U.S. Dist. LEXIS 8915
    (S.D. Ohio 2019) …………………….….…………………….………… 15, 16, 22, 23

*Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998) ……………………..……….... 15

*Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. 1694 (1985) ……………………....…... 14, 19

*Thomas v. City of Columbus,* 854 F.3d 361 (6th Cir. 2017) ……………….……….…... 14, 15

*Thornton v. City of Columbus*, 727 Fed.Appx. 829 (6th Cir. 2018) ………………….……... 23

*Tolan v. Cotton*, 572 U.S. 650 (2014) ……………….…..….….…..……….……..…... 22

*Ward v. County of Cuyahoga*, 721 F. Supp. 2d 677 (N.D. Ohio 2010) …………………...….…... 15

*White v. Pauly*, 137 S.Ct. 548 (2017) ……………….………..…………………….….…... 22

**RULES**                                                                 **PAGES**

Fed. R. Civ. P. 56(c) ……………………….……………………(c)………….….…. 13

iv

**STATUTES**                                                                    **PAGES**

United States Constitution …………………………..…………………………...……… *passim*

Ohio Rev. Code § 2744.03 …………………………..……………………………..…... 24

Ohio Rev. Code § 2923.12 …………………..……..……………………..…..……….. 12

Ohio Rev. Code § 2923.125 …………………..…..……..………………….…..…….. 12

v

## INTRODUCTION

Defendant John Turnure shot and seriously injured Plaintiffs Latrent Redrick and Jamon Pruiett without justification and in violation of their constitutional rights. Disputed material facts—including testimonial and video evidence contradicting Turnure's account—preclude summary judgment in this case. Plaintiffs oppose Turnure's Motion for Summary Judgment, and asks the Court to permit this case to proceed to trial.

## STATEMENT OF FACTS

I.    **EVENTS OF OCTOBER 1, 2017**

### A.  Menacing Men Looking for a Fight on Akron Streets Threaten Redrick, Pruiett, and their Friends.

October 1, 2017, Latrent Redrick and his brother, 24-year-old Jamon Pruiett, gathered with friends in Akron, Ohio to celebrate Redrick's 21st birthday. Redrick's party was alcohol-free. (Pruiett Testimony, R. 19-1, PageID#113, p. 3; Brantley Testimony, R. 23-7, PageID#258, p. 91; Redrick Testimony, R. 20-1, PageID#134, p. 4.) They traveled from Cleveland to Akron for the party, held at a hall called Truth. (Redrick Test., R. 20-1, PageID#134, p. 7-8.) Joseph Brantley was one of the friends in attendance. (Pruiett Test., R. 19-1, PageID#113, p. 3; Brantley Test., R. 23-7, PageID#258, p. 87.)

After the party, Redrick and a group of his friends stopped to use the bathroom at a friend's apartment, located above the Zar Nightclub (hereinafter "Zar"). They planned to stop for food at a stand near Zar and then go home. (Pruiett Test., R. 19-1, PageID#115, p. 9; Brantley Test., R. 23-7, PageID#259, p. 89-90.)

As the group ordered food at the stand, a fight broke out near Zar. (Redrick Testimony, R. 20-1, PageID#136, p.12.) Redrick, Pruiett, and their friends were not involved in the fight. (Redrick Test., R. 20-1, PageID#143, p.39.) In response to the fight, police stationed at Zar ushered

people across the street, down Main Street, and away from the bar. (Pruiett Test., R. 19-1, PageID#115, p.10; Redrick Test., R. 20-1, PageID#137, p.14; Brantley Test., R. 23-7, PageID#258, p. 92.) Redrick, Pruiett, and their friends crossed the street in the direction of their car, with the intention of going straight home. The car was parked in a lot down the street, past a Goodwill boutique called "Blue" (hereinafter "Blue" or "Goodwill"). (Redrick Test., R. 20-1, PageID#137, 143, p.13-14, 40; Pruiett Test., R. 19-1, PageID#115, p.11; Ex. 1. Jones Testimony, p. 22; *see also* Ex. 2, Road Map and Ex. 3, Satellite Map and Street View.)

As they headed toward the car, Redrick, Pruiett, Brantley, and their friends saw a large group of menacing-looking men, many of whom wore hoods tied tightly, obscuring their faces. (Pruiett Test., R. 19-1, PageID#115, p.11.) These hoods tied so tightly indicated to Redrick and Pruiett that the men were attempting to hide their identities because they were looking for a fight. (Pruiett Test., R. 19-1, PageID#115, p.11; Redrick Test., R. 20-1, PageID#13, p.17.) Redrick and Pruiett hoped they could pass by this group without a problem, get to the car, and leave. (Pruiett Test., R. 19-1, PageID#115, p.12.) However, as they were passing, some of the menacing-looking men bumped into TJ, one of the friends in Redrick's and Pruiett's group. The men threatened TJ, saying, for example: "What are you looking at, little guy? I'll beat your ass," and "Little n*****. What you putting your pants up for before I beat your ass." (Redrick Test., R. 20-1, PageID#138, p.19; Brantley Test., R. 23-7, PageID#260, p. 94-95.)

Redrick was very concerned that he and his group of friends were going to be jumped or harmed. (Redrick Test., R. 20-1, PageID#138, p.19; PageID#149, p. 61-62.) Pruiett, too, was concerned about the potential for being subject to a beat-down from the menacing men. (Pruiett Test., R. 19-1, PageID#116, pp.13, 16.)

2

Redrick, Pruiett, and their friends exchanged words with the menacing men. (Ex. 1, Jones Test., p. 25; Pruiett Test., R. 19-1, PageID#117, p.17.) The menacing men, including one man named Demarkus Minter, continued to threaten Redrick, Pruiett, and their friends, including jabs about Cleveland/Akron rivalry, such as, "I'll beat you all ass away from Akron." (Brantley Test., R. 23-7, PageID#260, p. 95; Ex. 1, Jones Test., pp.11, 32; Pruiett Test., R. 19-1, PageID#116, p.14; Redrick Test., R. 20-1, PageID#139, p.21.) The group of menacing men significantly outnumbered Redrick, Pruiett, and their friends. (Pruiett Test., R. 19-1, PageID#117, p.17.) Pruiett believed the group of menacing men was capable of anything, including potentially shooting at him and his friends. (Pruiett Test., R. 19-1, PageID#116, p.14.)

### B. Redrick Attempts to Deescalate the Situation in Line with his CCW Training, but Never Raises or Points His Gun.

Redrick was carrying a legal firearm in his pocket. (Redrick Test., R. 20-1, PageID#150, p. 67.) He was licensed to carry a concealed weapon. (Pruiett Test., R. 19-1, PageID#115, p.12.) Redrick learned in his CCW class that he was legally permitted to show and announce his weapon if he felt threatened in order to deescalate a situation. (Redrick Test., R. 20-1, PageID#147, p 54.)

Redrick followed this training. He "pulled" or showed his gun to the menacing men by placing his hand on the butt of the gun, and lifting it partially out of his pocket, with the handle of the gun visible to the men. (Redrick Test., R. 20-1, PageID#138, p.19; Ex. 4, Redrick Affidavit, at ¶6; Brantley Test., R. 23-7, PageID#260, p. 96.) Redrick said, "I have a license to carry, CCW, get back." (Pruiett Test., R. 19-1, PageID#116, p.13.) Redrick did not point the gun at anyone at any time. He never pointed the gun at a crowd. He never raised the gun or held the gun with his arm outstretched. He never held the gun at shoulder height. Redrick never pulled the gun fully out of his pocket. He never had the gun out of his pocket, held at his side. Redrick never put his finger on the trigger. Redrick never stated that he had any intention of using the gun. (Ex. 4, Redrick Aff.

at ¶¶8-14.) Neither Pruiett nor Brantley ever saw Redrick pulled his gun out or brandish it in any way. (Pruiett Test., R. 19-1, PageID#116, p. 13, 15; Brantley Test., R. 23-7, PageID#264, p. 110.)

Redrick did not intend to shoot anyone. (Redrick Test., R. 20-1, PageID#139, p.23.) He merely wanted to deescalate the situation. (Redrick Test., R. 20-1, PageID#54-55; Ex. 4, Redrick Affidavit.) After Redrick announced that he was armed, many of the menacing men dispersed. (Pruiett Test., R. 19-1, PageID#116, p.15.) Redrick indeed achieved some de-escalation of the situation by announcing his CCW license. (Pruiett Test., R. 19-1, PageID#117, p.17.)

Redrick's testimony that he never raised or pointed the gun at anyone is also corroborated by Akron Police Officer Al Jones.[1] Jones watched as Redrick and Pruiett crossed the street and as they stepped up onto the sidewalk in front of Goodwill. Jones approached the area when he noticed his nephew, Demarkus Minter, and the other menacing men begin arguing with Redrick, Pruiett, and their friends. (Ex. 1, Jones Test., pp. 11-12, 22-27.) Jones walked down Main Street toward the two groups of young men to tell Minter to cut it out and leave. (*Id*. at 11-12.)

As he approached, Jones never saw anyone waiving a gun. (Ex. 1, Jones Test., pp. 27-28.) In fact, Jones did not see a gun at all—and did not feel the need to pull his firearm. Instead he only had his pepper spray ready to address the fight if needed. (*Id*. at 13, 19.) Had anyone come close to Jones' nephew—who was in the group of menacing men—and pointed a gun at him, Jones would have seen it. (*Id*. at p. 30-31.) Jones is unequivocal: he never saw anyone point a gun at Minter. (*Id*. at p. 30-31.) Jones did not pull his own firearm until after Turnure shot Redrick and Pruiett. (*Id*. at p. 20.)

---

[1] Al Jones is a Detective with the Akron Police Department. He has been an Akron Police Officer for 27 years. (Ex. 1, Jones Test., p. 2-3.) On October 1, 2017, he was working secondary employment at Zar. (Ex. 1, Jones Test., p. 5-6.)

### C. Turnure's Account of Redrick's Conduct Prior to the Shooting Contradicts Redrick, Pruiett, Brantley, and Fellow Officer Al Jones.

Defendant Turnure and his partner that night, Utomhin Okoh, present an entirely different story.[2] In his motion, as in his testimony, Turnure and Okoh claim that they "saw [Redrick] raise what appeared to be a pistol up to shoulder height and continued walking toward individuals that were standing on the corner of East Exchange Street and South Main Street." (Motion at 2, citing Okoh Testimony at 20-21.) Turnure says he saw "a suspect with an outstretched arm, with a gun in his hand, pointing it at people on the sidewalk." (Motion at 2, citing Turnure Testimony at 26, 28.) Turnure claimed that he then saw Redrick with "a gun down at his side." (Motion at 3, citing Turnure Test., R.23-9, PageID#319, p. 13.)

Turnure claims that, in response to this alleged conduct by Redrick, he screamed at Officer Jones, "Al, he's got a gun. Al. He's got a gun." Turnure also claims that he "had [his] gun drawn.... My gun is pointed at [Redrick]. And I'm screaming now with [sic] at the suspect. I'm screaming, 'Drop the gun. Drop the gun. Drop the gun.'" (Motion at 3, citing Turnure Test., R.23-9, PageID#319, p. 13.)

But other witnesses' testimony makes clear that not only did Turnure *never* see Redrick raise a pistol to shoulder height, hold a gun in an outstretched arm, point the gun at people on the sidewalk, or hold the gun by his side—but other testimony also makes clear that neither Turnure nor Okoh *ever* yelled or gave orders to drop the gun.

Officer Jones—who was standing just five to ten feet away from Redrick and Pruiett—

---

[2] While much of the incident is caught on surveillance video from Goodwill, the video does not show the entire corner or capture all of the material moments of this case. (Redrick Test., R. 20-1, PageID#137, p.16.) The alleged events Turnure cites as justification for this shooting conveniently take place in the moments and areas outside of what is captured on the surveillance video. The surveillance footage also does not include audio recording.

never heard Turnure scream his name. He never heard anyone yell, "Drop the gun." (Ex. 1, Jones Test., p. 14, 37-39; Pruiett Test., R. 19-1, PageID#117, p.18-19.) He never pulled his own gun.

Similarly, Redrick, Pruiett, and Brantley all testified that they never heard any officer announce himself or give any commands or orders to drop the gun. (Brantley Test., R. 23-7, PageID#261, p. 97, 100; Pruiett Test., R. 19-1, PageID#117, p.18; Ex. 4, Redrick Aff. at ¶¶18-20; Ex. 6, Pruiett Affidavit at ¶¶10-12.) They had no idea a shooting was about to happen until the second the first shot was fired. (Pruiett Test., R. 19-1, PageID#115, p.9.) Corroborating testimony that there were no orders to drop the gun, it is clear in the video of this shooting that no one turns or looks in the direction of Turnure or Okoh, who were allegedly screaming. (Pruiett Test., R. 19-1, PageID#117, p.10; Surveillance Footage at 03:44, manually filed by Defendants, R.22.) Had he heard any police orders, Pruiett would have reacted by complying immediately. (Pruiett Test., R. 19-1, PageID#117, p.19.)

### D. Turnure Shoots Redrick and Pruiett without Justification.

As Turnure approached from behind—unbeknownst to Redrick, Pruiett, Brantley, and the others—Redrick's gun remained in his pocket. (Ex. 4, Redrick Aff. at ¶¶16-17; Surveillance Footage at 03:43.) Redrick thought Minter and the menacing men were "trying to gang up with their friends." (Redrick Test., R. 20-1, p.66.) As he did the first time, Redrick again began to "pull" or show his gun to the menacing men by placing his hand on the butt of the gun. (Redrick Test., R. 20-1, PageID#150, p 67; Ex. 4, Redrick Aff. at ¶17; Surveillance Footage at 03:43.) He was again attempting to deescalate the situation. (Ex. 4, Redrick Aff. at ¶7.)

Again, like the first time, Redrick did not point the gun at anyone, nor did he point it into a crowd. He never raised the gun or held the gun in an outstretched arm. He never held the gun at shoulder height. Redrick never pulled the gun fully out of his pocket. He never had the gun out of his pocket, held at his side. Redrick never put his finger on the trigger. Redrick never stated that

6

he had any intention of using the gun. (Ex. 4, Redrick Aff. at ¶¶8-14; Surveillance Footage at 03:43.) But the moment Redrick put his hand on the butt of his gun, Turnure pulled the trigger and shot at Redrick, who stood in close proximity to Brantley and Puiett. (Redrick Test., R. 20-1, PageID#150, p 67; Surveillance Footage at 03:43.) Turnure's shots hit Redrick in the back. As Redrick was shot, his elbow jerked up involuntarily, and the gun went flying from his hand and skidded across the pavement.[3] Turnure saw the gun slide across the sidewalk. Redrick crumpled to the ground, unarmed, as Turnure continued to shoot. (Surveillance Footage at 03:46; Ex.4, Redrick Aff. At ¶¶21-23; Ex. 8, Turnure Stmt., p. 30.)

Turnure, contradicting the surveillance footage of this shooting, claims that he saw Redrick with the gun down at his side[4] and then "start to go into the motion of raising the firearm into a shooting position." (Turnure Test., R.23-7, PageID#323, p. 30; Ex. 8, Turnure Stmt., p. 10.) Redrick was "bringing that gun up." (Ex. 8, Turnure Stmt., p. 32.) Then Turnure pulled the trigger. (Turnure Test., R.23-7, PageID#323, p. 30.)

Turnure fired into Redrick's back. Redrick, Pruiett, and Brantley were all standing close together when the shooting began. (Surveillance Video at 3:44.) At that moment, neither Redrick nor Pruiett had any idea that a police officer was shooting at them. (Pruiett Test., R. 19-1, PageID#118, p.21; Redrick Test., R. 20-1, PageID#140, p 26-27.) Instead, they thought that the menacing group of men were shooting, but he did not know from what direction. (Pruiett Test., R. 19-1, PageID#118, p.22, 24; Redrick Test., R. 20-1, PageID#140, p 26-27.) Brantley also thought

---

[3] This is the first moment Officer Al Jones saw the gun. (Ex. 1, Jones Test., p. 13.)

[4] Turnure is also clear in his assertion that Redrick's gun was out of his pocket the whole time: he never saw Redrick put the gun back in his pocket, and "never saw [the gun] come out of [Redrick's] pocket, holster wherever he had it and I never saw it obviously go back in." (Ex. 8, Turnure Stmt., p. 14.)

the menacing men were shooting at them, but he thought the shots were coming from straight ahead. (Brantley Test., R. 23-7, PageID#261-262, pp. 97, 100-101.) Pruiett was terrified for his own life, and for the life of his brother. (Pruiett Test., R. 19-1, PageID#118, p.21.) Redrick and Brantley, too, both thought they or one of their friends was going to die. (Redrick Test., R. 20-1, PageID#142, p.33-34; Brantley Test., R. 23-7, PageID#262, p. 104.)

Pruiett saw his brother, Redrick, shot and on the ground. (Pruiett Test., R. 19-1, PageID#118, p.21.) Pruiett heard Redrick scream and thought his brother died. (Pruiett Test., R. 19-1, PageID#118, p.21-23.) The shooting continued. (Pruiett Test., R. 19-1, PageID#118, p.21.) Pruiett thought he would be the next to die. (Pruiett Test., R. 19-1, PageID#118, p.22-23.)

Though Redrick was on the ground, unarmed, and though there was no gun in any person's hand, Turnure continued to shoot. In surveillance footage of the shooting, Redrick's body visibly convulses as shots hit him even after the weapon has skidded away from him. (Surveillance Footage at 03:46.) Turnure continued to shoot despite his admission that he is not justified in shooting a person when "the gun is out of their hands or they've been incapacitated." (Turnure Test., R.23-7, PageID#323, p. 30.)

As Redrick falls to the ground, Pruiett crouches down toward the pavement. (Surveillance Footage at 03:45.) Pruiett takes a couple steps, in a crouched position, and then gets down on the ground and reaches for the gun. Now curled on his side and laying on the ground, Pruiett pulls the gun to his chest, with the barrel pointed toward the ground. (Surveillance Footage at 03:47.) At this moment, Turnure begins shooting at Pruiett. Turnure shoots Pruiett multiple times. Only then, after being shot, does Pruiett—without knowing who's shooting at him— extend his arm, point the gun backwards, and he fires off one shot. (Surveillance Footage at 03:49.) Only after this shot did Turnure stopped shooting. Jones stood nearby throughout this entire incident, yet never felt the

8

need to pull his own firearm until after Turnure stopped shooting. Even then, he only did so in an effort to cover the scene in the aftermath of Turnure's use of force. (Ex. 1, Jones Test., at 20; Surveillance Footage at 3:43-3:53.)

Pruiett grabbed Redrick's gun, which was lying on the sidewalk, because an unknown person was firing in his direction. He wanted to make the shooting stop. (Pruiett Test., R. 19-1, PageID#118, p.21.) Pruiett, still unaware of who was shooting at him and his brother, fired one shot, with his head down, in the direction of the shooting. (Pruiett Test., R. 19-1, PageID#119-121, pp.28-29, 35.) He did not know he was shooting at a police officer. (Pruiett Test., R. 19-1, PageID#121, p.35.) But-for being shot at and being hit by Turnure's bullets, Pruiett would never have picked up nor fired the gun. (Ex. 6, Pruiett Affidavit, at ¶¶14-15.)

When Turnure finally stopped shooting, he backed away. He tripped and fell, and Okoh scooped him up and took him to the opposite side of the street. But then Turnure ran back up to Redrick and Pruiett, who were bleeding out from their gunshot wounds. Latrent was pleading for help, begging, "pick me up, please." Turnure pointed his gun at Redrick and looked down at them on the ground. With his gun pointed, he spat out the words, "Fuck you."[5] (Surveillance Footage at 06:14; Turnure Body Camera at 01:08, manually filed as Ex. 7; Turner Test., R.23-9, PageID#330, 338, pp. 57, 91-92.) Jones was also near Redrick and Pruiett, with his foot on top of the gun. He admonished Turnure, saying "They're cool." (Turnure Statement, attached as Ex. 8[6], at p. 8.) Other

---

[5] Turnure also testified at another point that he did not yell "Fuck you" at Redrick and Pruiett as they bled on the sidewalk, but eventually he was forced to admit this was not true when confronted with the video. (Turnure Test., R.23-9, PageID#330, 338, pp.57, 91-92.)

[6] Though the document produced in discovery by Defendants—attached as Exhibit 8—is dated April 16, 2019, the correct date that this interview's transcript was finalized is January 25, 2018.

officers had to pull Turnure away. He didn't want to go. Turnure said, "Mother fuckers." (Turnure Test., R.23-9, PageID#330, 340, pp. 59, 99.)

Once on the other side of the street, Okoh approached Turnure to talk. Before he would talk about what happened, Turnure signaled to Okoh to turn off his body camera. (Okoh Body Camera at 04:58, manually filed as Ex. 9.) Turnure's order to Okoh precluded any record of Turnure's statements about these events in their immediate aftermath from being made.

### E. Redrick and Pruiett Have Emergency Trauma Surgery and Akron Police Officers Interrogate and Arrest Pruiett at the Hospital.

Pruiett and Redrick were taken to the hospital for emergency trauma surgery. When Pruiett awoke from surgery, he realized his foot was handcuffed to the hospital bed and an officer was present in the room. (Pruiett Test., R. 19-1, PageID#121, p.33.) He was interrogated straight out of surgery, still under the effects of anesthesia, even though he was unable to communicate coherently or accurately. (Ex. 6, Pruiett Aff. at ¶¶17-18.) Though the handcuffs were eventually removed, when Pruiett was discharged from the hospital the next day, he was immediately arrested by Akron Police. They took him to the Summit County Jail directly from the hospital. He remained in custody at the jail for one night. (Pruiett Test., R. 19-1, PageID#121, p.34-35; Ex. 6, Pruiett Aff. at ¶¶19-22.)  Redrick remained in critical condition and was in the hospital for twelve days. He was finally released, only to return to another hospital five days later for complications due to blood clots resulting from his injuries caused when shot Defendant Turnure shot him. (Ex. 4, Redrick Aff. at ¶¶24-25.)

### F. Redrick and Pruiett Are Charged with Crimes Arising from Turnure's Use of Deadly Force against Them, Face Prosecution for Months, and Are Subjected to a Criminal Trial.

Prior to these events, neither Redrick nor Pruiett had been convicted of a felony. (Pruiett Test., R. 19-1, PageID#113, p. 3; Redrick Test., R. 20-1, Page ID#135, p.5-6.) However,

Defendant Turnure's unjustified use of deadly force against Redrick and Pruiett resulted in a Kafkaesque chain of events. On October 2, 2017, Akron Sgt. Lietke and Detective Troy Looney initiated charges against Redrick and Pruiett. (Affs. for Arrest Summons and Complaints R. 23-2, PageID#197 -202.) Redrick was charged with two counts of inducing panic. *Id.* Pruiett was charged with one count of felonious assault on a peace officer. *Id.* Subsequently, Redrick and Pruiett were indicted by a grand jury on November 16, 2017. The grand jury indicted Pruiett with felonious assault, a felony of the first degree, and a gun specification and Redrick with inducing panic, a felony of the fourth degree. On January 4, 2018, the grand jury issued a supplemental indictment of Redrick on two counts of felonious assault, felonies of the second degree, with a gun specification. (Indictments, R. 23-3, PageID#203-206.) These charges carry years of mandatory prison time if convicted.

Pruiett was in custody, and was forced to post bond money in the amount of $25,000.00. (Clerk of Court Record, R. 23-2, PageID#200; Pruiett Aff. at ¶23.) Redrick and Pruiett endured the constraints of pretrial conditions and suffered from the weight of prosecution hanging over their heads for 10 months. (Indictments, R. 23-3, PageID#203-206; Journal Entries, R. 23-4, PageID#207-209.) Eventually, Redrick and Pruiett were forced to defend against Turnure's false allegations at trial. Redrick, facing the risk of multiple lifetime felony convictions carrying mandatory prison time, accepted a plea deal for a misdemeanor offered by the Summit County Prosecutor mid-trial. (Redrick Trial Journal Entry, R. 23-4, PageID#207-208.) He plead no contest to Inducing Panic ORC 2917.31(A)(3)(C)(2), a misdemeanor of the first degree and received a suspended sentence and six months of non-reporting community control sanctions. Pruiett continued through to the end of the jury trial. *Id.* The jury acquitted him on all charges. (Pruiett Trial Journal Entry, R. 23-4, PageID#209.)

## II.    TURNURE CAUSED PERMANENT INJURY TO REDRICK AND PRUIETT.

Plaintiffs, who are still young men, will suffer the effects of Turnure's unjustified use of force for the rest of their lives. Turnure's gunshots shattered Pruiett's bones in his right foot, and fractured his left knee, causing ongoing pain and limited mobility. He is permanently scarred about his body. A bullet remains in his left shoulder. (Pruiett Test., R. 19-1, PageID#121, p.33.)  Turnure shot Redrick at least four times to his back, once to his elbow, and once to his right ankle. His hip and ankle were broken. He survived four surgeries. Doctors had to remove his gallbladder and repair damage to his kidney. For some time, Redrick lived with a stent connecting his kidney to his bladder. He continues to suffer from severe nerve damage. He was unable to walk for months. (Redrick Test., R. 20-1, PageID#142, p.33.)

## III.   OHIO GUN LAWS AND REDRICK'S LICENSE ALLOW FOR CONCEALED CARRYING AND OPEN CARRYING OF A FIREARM.

Ohio is an open-carry state. Individuals who legally possess firearms may openly carry those firearms in public—even if loaded. Further, a person may lawfully carry a concealed handgun with a valid concealed handgun license. Ohio Rev. Code § 2923.12(C)(2). A person may obtain a concealed handgun license by following the procedure set forth in Ohio Rev. Code § 2923.125. This statute requires a person to submit to the county sheriff, *inter alia*, an application and supporting documentation. *Id.* Redrick had a valid concealed handgun license on the date he was shot by Turnure. (Redrick Test., R. 20-1, Page ID#145, p. 46.) To obtain this license, Redrick was required to have a record clear of felony convictions and other specific crimes. Ohio Rev. Code § 2923.125(D)(1).

## IV.    TURNURE'S CONDUCT VIOLATED WELL-ESTABLISHED LAW ENFORCEMENT STANDARDS.

Police practices expert Roy G. Taylor found that Turnure's actions on October 1, 2017 were contrary to accepted law enforcement training and well-established law enforcement

standards regarding the use of deadly force. Turnure's violations of recognized standards of law enforcement practices are causally connected to the escalation of events and the injuries suffered by Redrick and Pruiett. (Taylor Report, attached as Ex. 5.)

## LAW AND ARGUMENT

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the evidence shows no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears the initial burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court must view evidence in a light most favorable to Plaintiff and draw all reasonable inferences in her favor. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. at 255.

### II.  PLAINTIFFS' CONSTITUTIONAL CLAIM AGAINST TURNURE MUST PROCEED TO TRIAL.

Defendant Turnure used excessive force when he shot Plaintiffs Latrent Redrick and Jamon Pruiett. Turnure is not entitled to qualified immunity on Plaintiffs' Sixth Claim for Relief (Unconstitutional Seizure) and Plaintiffs' constitutional claim must advance to trial.

In assessing qualified immunity, courts ask two questions: (1) "whether the facts that a plaintiff has … shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In this analysis, the Court takes the facts "in the light most favorable to the party asserting the injury." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In this case, both questions resolve in favor of Plaintiffs. Disputed material facts underlie Plaintiffs'

constitutional claims against Turnure[7] and he is not entitled to qualified immunity.

**A. Turnure Violated Redrick's and Pruiett's Constitutional Rights.**

1.  <u>Analysis of Deadly Force at Summary Judgment</u>

An officer's use of deadly force is considered under a Fourth Amendment inquiry, and is subject to an objective reasonableness standard, which requires balancing the nature and quality of the intrusion on an individual's Fourth Amendment interests against the government's interests, and a determination of whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him. *Graham v. Connor*, 490 U.S. 386, 396-397 (1989). This determination rests upon "whether the totality of the circumstances justifies a particular sort of seizure." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006).

The use of deadly force is reasonable—and constitutional—only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Chappell v. City of Cleveland,* 585 F.3d 901, 908 (6th Cir. 2009); *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) ("[O]nly in rare instances may an officer seize a suspect by use of deadly force"). A police officer's belief that he faces an immediate threat of danger or serious physical harm must amount to more than mere guesswork or speculation. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Further, Defendant Turnure cannot merely rely on Redrick or Pruiett possessing a gun to justify deadly force. Holding a gun is merely one factor to be considered in assessing the totality of the circumstances. *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017). Even where a suspect possesses a deadly weapon, deadly force is *only* reasonable when officers are confronted

---

[7] Plaintiffs do not proceed on claims against Okuh or Leitke, and dismiss all claims against them. Plaintiffs further limit their claims against Turnure to Unconstitutional Seizure (Sixth Claim for Relief), Assault and Battery (First Claim for Relief), and Negligence – Willful, Wanton, and/or Reckless Conduct (Second Claim for Relief).

with additional indicia of immediate danger. *See,* e.g., *Id.*; *see also Hensley v. Price*, 876 F.3d 573, 583-584 (4th Cir. 2017). Even though Redrick and Pruiett possessed, at different times, what appeared to be a loaded gun, this "does not render the use of deadly force *per se* reasonable. 'Sometimes, the time or space available to an officer may mean that the reasonable thing to do is to monitor the suspect, issue a warning, or take cover.'" *Sherrod v. Williams*, No. 3:14-cv-454, 2019 U.S. Dist. LEXIS 8915, 2019 WL 267175 at *27-27 (S.D. 2019), citing *Thomas v. City of Columbus*, 854 F.3d 361, 366-67 (6th Cir. 2017). Further, a "rapidly developing situation … 'does not by itself legitimize the use of deadly force.'" *See*, e.g., *Ward v. County of Cuyahoga*, 721 F. Supp. 2d 677, 690 (N.D. Ohio 2010).

Ultimately, the Court must consider the facts of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The Court must also consider the conduct of other officers—namely Jones, who was at the scene, and had his eyes trained on the same altercation Turnure claims was the basis to use deadly force, and who never pulled his firearm except as a reaction to Turnure's shooting frenzy. The Sixth Circuit noted in *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989) that "the jury might reasonably consider why the other [] officer[] did not fire shots" when facing the same circumstances as the shooting officer.

Finally—and critically—"[w]hen 'the legal question . . . is completely dependent upon which view of the facts is accepted by the jury,' the District Court cannot grant a defendant police officer immunity from a deadly force claim." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) citing *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989). Courts must

15

examine "'all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts,'" *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014), and must "not simply accept what may be a self-serving account by the police officer, and must instead look at circumstantial evidence that, if believed, would tend to discredit the police story." *Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2010). The jury must weigh "competing inferences one might draw" from the facts "and their effect on the question of whether [the officer's] actions were objectively unreasonable." *Id*. Here, the jury must determine which view of the facts—and which inferences to draw—regarding circumstances facing Turnure at the moment he shot Redrick and Pruiett.

"The Court cannot grant summary judgment on the basis of qualified immunity if there is a genuine issue of material fact 'involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.'" *Sherrod*, 2019 U.S. Dist. LEXIS 8915 at *17, citing *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988); *Saucier*, 533 U.S. at 216 (Ginsburg, J., concurring) ("Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official. And that is as it should be.")

2. Turnure's Justification for Using Deadly Force against Redrick and Pruitt Is Based on Disputed Material Facts.

Every key piece of evidence Turnure points to as justification for using deadly force against Redrick and Pruiett is subject to dispute. He erroneously asserts that the facts are "undisputed" in spite of obvious, material disputes from multiple sources, including testimony from Redrick, Pruiett, Brantley, his fellow officer Al Jones, and the surveillance video that captured the shooting.

a. *The Facts, Taken in Redrick's Favor, Establish that Turnure's Use of Deadly Force against Him Was Unconstitutional.*

Turnure alleges that his use of deadly force against Redrick was justified because he: "observed Redrick raise a gun in the direction of two individuals standing in the middle of a crowd at bar closing time, causing people to panic," and therefore that Turnure had witnessed Redrick commit "severe" crimes. (Motion at 11.) Turnure also claims that "there can be no serious dispute that Turnure did not observe Redrick respond to the officers' commands to drop the gun," and that Redrick therefore engaged in "*apparent* defiance ... tantamount to active resistance." (Motion at 11.) Turnure also asserts that:

> With respect to the immediacy of the threat, the following undisputed facts establish that a reasonable officer on scene would have believed that Redrick's actions posed a significant physical threat to Turnure or the individuals on the sidewalk:
>
> (1)  Turnure observed Redrick pull a handgun on a crowd of people outside a bar in the midst of an altercation;
>
> (2)  moments later, Redrick was moving in the direction of the same group of individuals on the sidewalk with the gun at his side;
>
> (3)  Redrick does not respond to Turnure or Okoh's commands to drop the gun;
>
> (4)  there are several individuals at or around the sidewalk/street area near Redrick;
>
> (5)  Redrick maintains the handgun at his side with Turnure, Okoh, Jones and others in close proximity and without protective cover; and
>
> (6)  the handgun separates from Redrick's body.

(Motion at 12)(emphasis added).

Turnure claims that "the totality of these facts and circumstances ... gave Turnure probable cause to believe that Redrick posed an imminent threat of serious physical harm to Turnure, the individuals on the sidewalk in front of Redrick, or other bystanders." (Motion at 13.) Turnure claims that "[t]he *undisputed* manner in which Redrick was holding the gun ... would cause any

reasonable officer to believe that Redrick posed a serious physical threat that required a use of

deadly force." (Motion at 14-15.)

However, what we know from other evidence in the record is that:

(1)     Redrick never "pulled a handgun on a crowd of people";

(2)     Redrick never removed the gun from his pocket, never raised the gun, never
        held the gun at shoulder height, never pointed the gun at anyone, and never
        waived the gun around;

(3)     Redrick never held the gun down at his side;

(4)     Neither Turnure nor Okoh ever gave commands to drop the gun;

(5)     Redrick never engaged in "active resistance" or "*apparent* defiance"; and

(6)     At the time Turnure began shooting him, Redrick had not removed the gun
        from his pocket, the gun had not "separated from his body,"  the gun was
        not "start[ing] to go into the motion of raising the firearm into a shooting
        position," and Redrick had not "beg[u]n to raise his arm";

(7)     Turnure continued to shoot at Redrick even after the gun—which had been
        in his pocket until Turnure started shooting—was no longer in his
        possession.

These disputes of material fact—which encompass the entirety of Turnure's justification for use

of deadly force against Redrick—preclude summary judgment on Redrick's constitutional claim.

Taking the facts in a light most favorable to Redrick, there is no justification for this use

of deadly force. The facts, taken in Redrick's favor, are as follows:

(1)     Redrick was engaged, at most, in a verbal altercation with a group of
        menacing men who were looking to fight and cause harm to Redrick and his
        friends;

(2)     Redrick legally possessed a firearm in an open-carry state, and had a license
        to carry a concealed weapon;

(3)     In line with his CCW training, Redrick merely put his hand on the butt of his
        gun, pulling it only partially out of his pocket, so that the men threatening him
        and his friends would know he was armed, in hopes that this would end the
        verbal altercation;

(4)     Redrick never engaged in any conduct that indicated he imminently intended to use his gun, and had no actual intention to use his gun;

(5)     Turnure shot Redrick in the back in the absence of an actual or imminent threat of death or serious physical harm to himself or others, based only on the observation that Redrick had a gun in his pocket—not an illegal act;

(6)     Turnure continued to shoot Redrick even after Redrick was no longer armed;

(7)     Turnure fabricated facts in the aftermath about Redrick's conduct to create a perception of a threat.

At best, Turnure shot Redrick based on incorrect speculation that Redrick *might* pull his gun out of his pocket and *might* then use the gun. But a police officer's belief that he or others face an immediate threat of danger or serious physical harm must amount to more than mere guesswork or speculation. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Disputed material facts underlying Turnure's shooting of Redrick require this case to go to a jury.

> b.  *The Facts, Taken in Pruiett's Favor, Establish that Turnure's Use of Deadly Force against Him Was Unconstitutional.*

Turning to Pruiett, Turnure alleges that his use of deadly force here was justified because "Pruiett picked up the gun, pointed it in the direction of Turnure and discharged the gun. At the time Turnure employed deadly force, he had reason to believe that Pruiett committed felonious assault (cause or attempt to cause physical harm to another)." (Motion at 17.) Turnure alleges that he witnessed Pruiett commit a "severe" crime as the basis for his decision to use deadly force.

Turnure also alleges that—as a basis for his decision to begin shooting at Pruiett—that "suddenly lunging for a gun during an active shooting, grabbing the gun and discharging the gun in the direction of an officer" constituted active resistance, justifying Turnure's use of deadly force. (Motion at 17.)

Turnure also claims "immediacy" of an alleged threat of death or serious physical harm because of "Pruiett's initial actions of suddenly lunging for a gun, grabbing the gun and turning in

the direction of the officer." (Motion at 17.)

But Turnure fails to note a critical issue: at the time he started shooting Pruiett, Pruiett had merely grabbed the gun, pulled it to his chest, with the barrel pointed toward the ground. The surveillance video shows that Pruiett had not turned the gun "in the direction of the officer" and had not "discharge[ed] the gun in the direction of an officer" when Turnure started shooting. There were no indicia that Pruiett would actually use—rather than just hold and keep safe—the gun at the time Turnure began shooting.

Yet again, disputes of material fact—which encompass the entirety of Turnure's justification for use of deadly force against Pruiett—preclude summary judgment on Pruiett's constitutional claim. Taking the facts in a light most favorable to Pruiett, there is no justification for this use of deadly force. The facts, taken in Pruiett's favor, are as follows:

(1)   Turnure had not witnessed anyone point a gun in the direction of any person, raise a gun, hold a gun at shoulder height, or waive a gun around;

(2)   Turnure had merely witnessed a verbal altercation, and at best, saw a gun in someone's pocket, and a hand on the butt of that gun;

(3)   Turnure was engaging in police duties in an open-carry state where licenses to conceal-carry firearms are available and legal;

(4)   Turnure had not witnessed any person engage in conduct that indicated intent to use a gun;

(5)   Turnure already shot—from behind—a person without any lawful justification, based only on the observation that the person had a gun in his pocket—not an illegal act;

(6)   Turnure continued to shoot that person even though he was unarmed;

(7)   Turnure then saw another person merely grab and hold the gun that had fallen to the ground, pointing the muzzle of that gun toward the sidewalk, and not at any person;

(8)   Holding a gun is not illegal in Ohio;

(9)   Turnure then began shooting the second person—Pruiett—without any indication that Pruiett intended to use the gun;

20

(10)  Only after Turnure shot did the person shoot back, causing Turnure to cease firing;

(11)  Turnure then fabricated facts in the aftermath about Redrick's and Pruiett's conduct to create a perception of a threat.

Turnure simply did not have probable cause to believe that Pruiett posed an imminent threat of serious physical harm at the time Turnure shot him. Turnure cannot rely on speculation or guesswork about what Pruiett might have done to justify the use of deadly force. The record also bears out that had Turnure not shot at Pruiett—had the shooting already stopped—Pruiett would not have fired the single shot in defense of himself and his brother at an unknown shooter.

The totality of the circumstances, taken in a light most favorable to Plaintiffs, establish that Turnure violated Pruiett's constitutional rights. Disputed material facts underlying Turnure's shooting of Pruiett require this case to go to a jury.

### B. Redrick's and Pruiett's Right to Be Free from Excessive Force Was Clearly Established on the Date Turnure Shot Them.

Contrary to Turnure's arguments, the "clearly established" prong of the *Saucier* test is also met here: the right to be free from deadly force when not posing an imminent threat to others is clearly established in the Sixth Circuit, and was clearly established before Turnure shot Redrick and Pruiett in October 2017. *See*, e.g., *Jones v. Sandusky*, 541 Fed. Appx. at 665-66, citing *Bletz v. Gribble*, 641 F.3d 743, 752 (6th Cir. 2011); *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006).

A defendant "violate[s] a clearly established right [where] the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014). In addressing the second prong of the qualified immunity analysis, however, the Court must draw all inferences in

21

favor of the non-moving party and cannot resolve any genuine issues of material fact. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

A recent decision, *Sherrod v. Williams*, No. 3:14-cv-454, 2019 U.S. Dist. LEXIS 8915 (S.D. Ohio 2019), is instructive for resolving any doubt about whether Plaintiffs' rights were clearly established in 2017. In a lengthy analysis of the 2014 shooting of John Crawford and deadly force cases decided at that time, *Sherrod* explains that even under the specificity requirements of *Mullenix v. Luna*, 136 S.Ct. 305 (2015) and *White v. Pauly*, 137 S.Ct. 548 (2017), *et seq.*, "the law is clearly established that, even when officers respond to a report that a suspect is brandishing a loaded gun, the use of deadly force is not justified unless the suspect either points the gun ***at*** the officers or makes some other kind of movement, gesture or verbal statement giving rise to a reasonable belief that the officers or others were in imminent danger of serious bodily harm." *Sherrod* at *43-44. *See also*, e.g., *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012); *Bouggess v. Mattingly*, 482 F.3d 886, 895 (6th Cir. 2007), citing *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996).

Here, the record is replete with disputes. As in *Sherrod*, until a jury resolves the critical factual disputes around whether Redrick pointed the gun into a crowd, whether Turnure or Okoh actually ever gave any orders to drop the gun, whether Turnure fabricated that Redrick did not comply with orders, and whether Redrick "start[ed] to go into the motion of raising the firearm into a shooting position" or "began to raise his arm,", it cannot be determined whether Turnure's use of deadly force against Redrick violated a clearly established right. Likewise, until the jury examines Turnure's account about Pruiett's conduct (taken in concert with its findings on Redrick's, Turnure's and Okoh's conduct), and until the jury determines whether Pruiett turned the gun in Turnure's direction and discharged the gun *before* Turnure shot—as Turnure claims—

it cannot be determined whether Turnure's use of deadly force against Pruiett violated a clearly established right. There are material disputes of fact concerning whether Redrick and/or Pruiett engaged in any furtive movement, harrowing gesture, or serious verbal threat that might create an immediate threat. Summary judgment must be denied for Turnure.

Notwithstanding the series of applicable cases in *Sherrod* making clear that Redrick's and Pruiett's rights were clearly established, a case directly on point is not required. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015)(citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Taking the facts in a light most favorable to Plaintiffs, Turnure is not protected by qualified immunity because "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Turnure had "fair notice." *Hope*, 536 U.S. at 739. Summary judgment must be denied.

Turnure cites several cases to argue that there was no constitutional violation here. (*See* Motion at 13-15, 17-19, citing *Thornton v. City of Columbus*, 727 Fed.Appx. 829 (6th Cir. 2018); *Lemmon v. City of Akron*, 768 Fed.Appx. 410 (6th Cir. 2019); *Pollard v. City of Columbus*, 780 F.3d 395 (6th Cir. 2015); *Chappell v. City of Cleveland*, 585 F. 3d 901 (6th Cir. 2009).) These cases are factually distinguishable—and further, involve undisputed facts giving rise to a reasonable perception of an imminent threat of death or serious harm.[8]

---

[8] E.g., *Thornton v. City of Columbus*, 727 Fed.Appx. 829 (6th Cir. 2018)(no genuine dispute over whether officers responded to a report of a man threatening others with a gun while standing on a front porch of a residence, whether several individuals informed officers that the man ran in the residence while possessing a firearm, or whether officers saw the man emerged in their direction with a shotgun, in addition to seeing an assault rifle in the living room); *Lemmon v. City of Akron*, 768 Fed.Appx. 410 (6th Cir. 2019) (no genuine dispute over whether man aiding in the execution of an armed robbery, fled the scene of the crime, participated in a heated standoff with four officers, placed his hand in his waistband in a manner that would lead a reasonable person to believe danger existed and refused to remove his hand, daring officers to shoot him, and no dispute that man was

Turnure violated Redrick's and Pruiett's constitutional rights. Summary judgment must be denied on this claim.

## III.    PLAINTIFFS' STATE LAW CLAIMS AGAINST TURNURE MUST PROCEED TO TRIAL.

Like Plaintiffs' constitutional claims, disputed material facts underly Plaintiffs' state law claims. These claims must also survive summary judgment.

First, as to Plaintiffs' First Claim for Relief against Turnure (Assault and Battery), Turnure knowingly caused physical harm to Redrick and Pruiett by unlawful use of deadly force which was excessive and offensive, evidenced by Plaintiffs' extreme injuries and suffering. Turnure proximately caused Plaintiffs' injuries, constituting assault and battery.

As to Plaintiffs' Second Claim for Relief against Turnure (Negligence – Willful, Wanton, and/or Reckless Conduct), Turnure had a duty to exercise due care—established in the Constitution, common law, well-established law enforcement standards, and other sources— toward Redrick and Pruiett.  Turnure's conduct, described above constitutes a breach of that duty and was willful, wanton, and/or reckless. Plaintiffs' injuries were foreseeable, and Turnure proximately caused the injuries. Political subdivision employees who engage in "acts or omissions with malicious purpose, in bad faith, or in a wanton or reckless manner" are not immune from suit in Ohio. Ohio Rev. Code § 2744.03(6); *Anderson v. Massillon*, 134 Ohio St.3d. 380, 983 N.E. 2nd 266 (2012) at ¶23. The same acts depriving Turnure of qualified immunity deprive him of §2744

---

resisting arrest when he was ultimately shot); *Pollard v. City of Columbus*, 780 F.3d 395 (6th Cir. 2015) (no genuine dispute that man led police on a dangerous high-speed chase ending in a crash, and when man regained consciousness, he reached down into his car, refused orders to show his hands, then extended his hands in a shooting posture pointed at officers); *Chappell v. City of Cleveland*, 585 F. 3d 901 (6th Cir. 2009) (no genuine dispute that male suspect was found by officers hiding in a bedroom closet during a protective sweep, and then officers ordered him to come out and show his hands, he came toward officers with a knife upheld, ignored their commands to drop the knife, and continued to move toward officers in close quarters.)

immunity: these acts could be interpreted by a reasonable jury as willful, wanton, or reckless conduct. *See*, e.g., *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013); *Reynolds v. Oakwood*, 38 Ohio App.3d 125, 127 (Ohio Ct. App. 1987), citing *Botto v. Fischesser*, 174 Ohio St. 322, 325-26, (1963). Turnure is not entitled to Ohio statutory immunity.

## IV. PLAINTIFFS' DEMAND FOR PUNITIVE DAMAGES SURVIVES SUMMARY JUDGMENT.

Plaintiffs' demand for punitive damages is supported in the record, and questions of fact remain for jury consideration on this issue.  As Turnure recognizes, "[p]unitive damages may be awarded in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Motion at 25; *Dorr v. City of Ecorse*, 305 F. App'x 270, 277-78 (6th Cir. 2008), citing *Hill v. Marshall,* 962 F.2d 1209, 1217 (6th Cir. 1992). In the aftermath of this shooting, Turnure ran up to his victims, and as one of them begged for help, he pointed his gun at them and spat out, "Fuck you." He was so worked up that even after a fellow officer who witnessed the entire event told him, "They're cool," other officers still had to pull Turnure away as he said, "Mother fuckers." Here, there is ample evidence from which the jury could infer Turnure's malicious intent or reckless indifference to federally protected rights. There is sufficient evidence to present a question of fact for the jury on the issue of punitive damages.

## CONCLUSION

For the reasons stated above, Plaintiffs ask the Court to deny Defendant Turnure's Motion for Summary Judgment and to permit this case to proceed to trial.

Respectfully submitted,

*/s/ Jacqueline Greene*
Sarah Gelsomino (0084340)
Jacqueline Greene (0092733)
Marcus Sidoti (0077476)
Terry H. Gilbert (0021948)

FRIEDMAN & GILBERT
55 Public Square, Suite 1055
Cleveland, OH 44113-1901
T: (216) 241-1430
F: (216) 621-0427
sgelsomino@f-glaw.com
jgreene@f-glaw.com
marcus@jordansidoti.com
tgilbert@f-glaw.com

Sydney S. Saffold (0093974)
SAFFOLD LAW, LLC
1220 West 6th Street, Suite 303
Cleveland, Ohio 44113
T: (216) 622-2700
F: (216) 622-2714
sydneysaffold@gmail.com

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that this case has been assigned to the standard track and that Plaintiffs' Brief in Opposition complies with the Court's December 4, 2019 Order (R.18) designating a page limitation of twenty-five pages.

*/s/ Jacqueline Greene*
Jacqueline Greene (0092733)
*One of the Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on December 20, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Jacqueline Greene*
Jacqueline Greene (0092733)
*One of the Attorneys for Plaintiffs*