UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| Latrent Redrick, et al., | ) | CASE NO. 5:18CV2523 |
| | ) | |
| Plaintiffs, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| City of Akron, Ohio, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter comes before the Court on a motion for summary judgment filed by Defendants John Turnure, Utomhin Okoh and Scott Lietke.[1] Plaintiffs Latrent Redrick and Jamon Pruiett have opposed the motion, and Defendants have replied. Plaintiffs have also sought leave to file a sur-reply, and Defendants have opposed that motion. The motion for leave (Doc. 29) is GRANTED. The Court will consider the sur-reply in reviewing the pending motion for summary judgment. For the reasons that follow, Defendants' motion is DENIED.

**I. Facts & Procedure**

On October 1, 2017, Redrick and his brother Pruiett were in downtown Akron, Ohio to celebrate Redrick's 21st birthday. Eventually, Redrick and Pruiett and several others ended up outside Zar Nightclub near closing time. While Redrick's group was attempting to place a food

---

[1] Within their response, Plaintiffs note: "Plaintiffs do not proceed on claims against Okuh [sic] or Leitke [sic], and dismiss all claims against them. Plaintiffs further limit their claims against Turnure to Unconstitutional Seizure (Sixth Claim for Relief), Assault and Battery (First Claim for Relief), and Negligence – Willful, Wanton, and/or Reckless Conduct (Second Claim for Relief)." Doc. 26 at 20. Accordingly, the claims against Defendants Okoh and Lietke are hereby dismissed, and the Court will solely analyze the remains counts against Defendant Turnure – counts one, two, and six.

order with a nearby food stand, a fight broke out at the exit of Zar. Turnure and Okoh were stationed downtown due to prior criminal activity that had occurred at or around the closing time of the downtown bars and nightclubs and observed this initial scuffle. At that time, the officers decided not to intervene unless matters escalated.

According to Redrick, a short time later, a group of individuals crossed paths with his group of friends and bumped into one of Redrick's friends. Redrick indicated that the other group was saying "a bunch of junk." Specifically, Redrick asserts that the other group was making threatening remarks to his friend, T.J. Redrick contends that in an attempt to de-escalate the situation, he revealed to the other group that he was carrying a conceal weapon.[2] At the time, Redrick possessed a concealed carry permit for the weapon.

Okoh contends that around this time he witnessed an individual, later identified as Redrick, raise a pistol to shoulder level and continue to approach another group of people. At that time, Okoh yelled to Turnure, "Gun, gun. He's got a gun." Turnure claimed to witness the same activity: "I look across the street to – on the other side of Main Street, and I see a suspect with an outstretched arm, with a gun in his hand, pointing it at people on the sidewalk." Turnure then exited his cruiser to cross the street to approach the suspect he claims to have witnessed holding a firearm. At that time, Turnure observes Officer Al Jones also approaching this same group of individuals.

According to Turnure, he attempted in vain to inform Jones of the imminent threat posed by the firearm: I am screaming at Al, "Gun, gun. Guy's got a gun." I was screaming it repeatedly. The only way I can describe it, it's a nightmare that when you scream, nothing comes out; or you're screaming and no one can hear you. It was along those lines. I'm just screaming, screaming, "Al,

---

[2] As discussed below, the parties do not agree to what extent Redrick did or did not remove the firearm from his pocket.

he's got a gun. Al. he's got a gun." Doc. 23-9 at 5-6. Jones, however, never heard any such statement from Turnure. Turnure then finished crossing the street and came up behind Redrick and his group of friends. According to Turnure, he was repeatedly screaming "Drop the gun" as he approached the group.

> I find myself behind the suspect with the gun in hand. I can now locate he's got a gun down at his side. I can see the butt of the gun in his hand, and I'm walking behind him. I had my gun drawn. My gun is pointed at him. And I'm screaming now [] at the suspect. I'm screaming, "Drop the gun. Drop the gun. Drop the gun."

Doc. 23-9 at 6. However, no one in the group or elsewhere on the street that night testified to hearing any statement from Turnure at any time.

Turnure's version of events continued:

> I'm following him, and the gun separates from his body in a manner. So I know there's potential victims in front of him. And he goes -- he begins the motion to raise the pistol. At that point, I begin to fire into the suspect's back.

Doc. 23-9 at 6. Turnure contends that he continued to fire his weapon only until Redrick was no longer in possession of the firearm. He then scanned the area and saw Pruiett diving for the firearm. At that time, he began firing at Pruiett. Pruiett returned a single shot in Turnure's direction. At that time, Turnure retreated. However, his initial actions resulted in Redrick being shot in the back four times, and Pruiett being shot as well.

Redrick's version of the events surrounding him being shot vary significantly from Turnure's account. As noted above, Redrick contends that he attempted to use the visibility of his firearm to deescalate the confrontation that was occurring with the second group of individuals.

> In an effort to deescalate the situation pursuant to my CCW training, I showed the gun to the group of menacing men by holding the butt of the gun, and lifting it partially out of my pocket so they could see the handle of the gun, while I announcing to them that I carried a gun.

Doc. 26-4 at 1. Redrick contends that he never fully removed the firearm from his pocket, never raised his arm holding the firearm, and never pointed the firearm at anyone. Describing the precise time of the shooting, Redrick offered the following in his affidavit:

> 17. I again placed my hand on the butt of my gun-but did not remove the gun from my pocket-when Turnure began to shoot me.
>
> 18. Prior to shooting me, Officer Turnure did not give any orders or commands to drop the gun.
>
> 19. Prior to shooting me, Officer Turnure did not announce his presence.
>
> 20. Prior to being shot, I did not know Officer Turnure was behind me.
>
> 21. When Officer Turnure shot me in the back, my elbow went up involuntarily and the gun flew out of my hand.

Doc. 26-4 at 2. Redrick further asserts that Turnure continued to shoot at him after he lost possession of the firearm and was on the ground with his hands in the air.

Based upon this version of events, Redrick and Pruiett filed a slew of claims against Turnure, Okoh, Leitke, and the City of Akron. As noted above, only three claims – all against Turnure – remain for this Court to consider in this motion for summary judgment: Unconstitutional Seizure (Sixth Claim for Relief), Assault and Battery (First Claim for Relief), and Negligence – Willful, Wanton, and/or Reckless Conduct (Second Claim for Relief). The Court now examines those claims.

**II. Legal Standard**

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue

of material fact. *Celotex Corp. v. Catrett,* 477 U.S. at 323. This is so that summary judgment can be used to dispose of claims and defenses which are factually unsupported. *Id.* at 324. The burden on the nonmoving party is to show, through the use of evidentiary materials, the existence of a material fact which must be tried. *Id.* The court's inquiry at the summary judgment stage is "the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250.

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. at 324. The nonmoving party must oppose a proper summary judgment motion "by any kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves ..." *Id.* Rule 56(c) states, "... [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." A scintilla of evidence in favor of the nonmoving party is not sufficient.

**III. Law and Analysis**

<u>§ 1983 claim for unlawful seizure</u>

Redrick and Pruiett raise a claim under 42 U.S.C. § 1983, alleging a constitutional violation of their Fourth Amendment rights to be free from unlawful seizure. To state a claim under § 1983, a plaintiff must set "forth facts that, when construed favorably, establish (1) the deprivation of a

right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (internal citation omitted). No one disputes that Turnure was acting under the color of state law. Rather, this motion challenges whether the rights of Redrick and Pruiett were indeed violated and if so whether the Turnure is entitled to qualified immunity.

Qualified immunity is appropriate when an official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11(2015) (internal citation omitted). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Court's qualified immunity analysis contains two components, which courts may analyze in any order: (1) whether the plaintiff has established with the requisite proof the violation of a constitutional right, and (2) whether the particularized right at issue was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232- 236 (2009). When a defendant invokes qualified immunity in a motion for summary judgment, the plaintiff must offer sufficient evidence to create a genuine dispute of fact that the defendant violated a clearly established right. *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608–09 (6th Cir. 2015).

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent

escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11–12, (1985). "This Circuit has employed a non-exhaustive list of three factors to evaluate whether an officer's actions are reasonable: '(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.' *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006)). But the ultimate inquiry is always whether the totality of the circumstances justified the use of force." *Littlejohn v. Myers*, 684 F. App'x 563, 567 (6th Cir. 2017). With respect to deadly force, the Sixth Circuit has further explained:

> With that said, this Court has explicitly stated—regardless of the other factors—that with respect to the use of deadly force, there is a minimum requirement that the officer have "probable cause to believe that the suspect poses a threat of severe physical harm, either to the officer or others." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). Our analysis turns on whether Myers had probable cause to believe that Littlejohn presented a serious danger to either himself or others at the moment Myers discharged his firearm. *See Bouggess v. Mattingly*, 482 F.3d 886, 890 (6th Cir. 2007) (the relevant time for purposes of this inquiry "is the moment immediately preceding the shooting"). As a general note, the mere fact that Littlejohn was a felon fleeing from police is not sufficient to justify the use of deadly force. *Tennessee v. Garner*, 471 U.S. 1 (1985) ("It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). On the other hand, if a suspect threatens either an officer or any other person with serious physical harm during flight, deadly force is authorized. *Dickerson*, 101 F.3d at 1163.

*Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). As such, the Court must undertake its analysis "in light of the facts and

circumstances confronting [the officers], without regard to their underlying intent or motivation."

*Id.* at 397.

    A. Redrick

With respect to Redrick, Turnure's arguments that his force was reasonable as premised upon numerous *disputed* facts:

> With respect to the severity of the crime at issue, Turnure observed Redrick raise a gun in the direction of two individuals standing in the middle of a crowd at bar closing time, causing people to panic.
>
> …
>
> With respect to active resistance and evasion by flight, there can be no serious dispute that Turnure did not observe Redrick respond to the officers' commands to drop the gun.
>
> …
>
> With respect to the immediacy of the threat, the following undisputed facts establish that a reasonable officer on scene would have believed that Redrick's actions posed a significant physical threat to Turnure or the individuals on the sidewalk: (1) Turnure observed Redrick pull a handgun on a crowd of people outside a bar in the midst of an altercation; (2) moments later, Redrick was moving in the direction of the same group of individuals on the sidewalk with the gun at his side; (3) Redrick does not respond to Turnure or Okoh's commands to drop the gun; (4) there are several individuals at or around the sidewalk/street area near Redrick; (5) Redrick maintains the handgun at his side with Turnure, Okoh, Jones and others in close proximity and without protective cover; and (6) the handgun separates from Redrick's body[.]

Doc. 23 at 18-19.

As noted above, Redrick denies ever raising the firearm and pointing it at anyone. In fact, Redrick contends that the firearm never fully left his pocket prior to him being shot by Turnure. While Turnure contends that Redrick's prior sworn testimony contradicts this assertion, the Court disagrees. Rather, Redrick's prior sworn testimony indicated that Redrick "showed" the firearm to the opposing group of individuals. Contrary to Turnure's contention, that is not an admission

by Redrick that he fully removed the firearm from his pocket or raised it to shoulder level. As such, there remains an issue of fact surrounding whether Redrick engaged in *any* crime prior to the use of deadly force.

Turnure's contention that Redrick actively or passively resisted his command to drop the firearm fares no better. Turnure appears to contend that because his sworn testimony includes that he gave the command, this fact must be established as true. However, the record contains numerous examples of individuals that note that they never heard Turnure give any commands. This list includes Officer Jones who was in close proximity to the shooting and never heard any of things that Turnure allegedly shouted over and over. Thus, while the Court may be required to accept Turnure's assertion that he gave the command, it must also accept that whatever command Turnure gave was given in a manner that Redrick was unable to hear it. As such, at best, there exists a question of fact regarding whether Redrick ignored commands.

Finally, Turnure alleges that the firearm separated from Redrick's body in the split second before he opened fire. Meanwhile, Redrick contends that he never made such a movement. Turnure asserts that this particular factual dispute can be resolved by virtue of the surveillance video that caught portions of the events at issue. In that regard, Turnure is correct that when evaluating the circumstances of Turnure's use of deadly force, "where, as here, there is 'a videotape capturing the events in question,' the court must 'view[] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012)(quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007). At the summary judgment stage, *Scott* "instructs [courts] to determine as a matter of law whether the events depicted on the video…show that the Officer's conduct was objectively reasonable." *Dunn v. Matatall*, 594 F.3d 348, 353 (6th Cir. 2008).

However, the dispute raised by the parties – whether Redrick began to remove the firearm from his pocket at the moment immediately before Turnure began to fire at him – cannot be resolved by viewing the grainy video from the nearby surveillance camera. The Court has viewed the video and closely reviewed the individual frames pulled from the video by the parties. The competing positions of the parties are both reasonable interpretations of the view. A jury could review the video and find Turnure's version of events to be credible – that he did not open fire until he saw movement from Redrick. Likewise, a reasonable juror could conclude that any movement from Redrick was the result of him being shot by Turnure. In other words, the frame-by-frame pictures presented to the Court simply do not provide a definitive view of the disputed event. Moreover, when evaluating the video of the event, this Court and "the jury might reasonably consider why the other [ ] officers did not fire shots if it was quite obvious that they were being threatened with imminent bodily harm." *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989).

Accordingly, every substantial aspect of the Court's totality-of-the-circumstances review is clouded by a dispute of facts. Viewing those facts in a light most favorable to Redrick, he committed no crime, resisted no lawful commands, and was shot from behind. Accordingly, his § 1983 claim survives.

For similar reasons, Turnure is not entitled to qualified immunity for this claim. In this respect, the Court agrees with a colleague from the Southern District of Ohio who noted:

> [T]he law is clearly established that, even when officers respond to a report that a suspect is brandishing a loaded gun, the use of deadly force is not justified unless the suspect either points the gun at the officers or makes some other kind of movement, gesture or verbal statement giving rise to a reasonable belief that the officers or others were in imminent danger of serious bodily harm.

*Sherrod v. Williams*, No. 3:14-CV-454, 2019 WL 267175, at *15 (S.D. Ohio Jan. 15, 2019).³ *Sherrod* went on to review the holding in *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012). *King* noted that "we have little trouble concluding that if Taylor shot King while he was lying on his couch and not pointing a gun at the officers, Taylor violated King's clearly-established right to be free from deadly force." *Id*. at 664. In that regard, *King* noted that there was a genuine issue of material fact surrounding whether the gun was pointed at the officer at the time of the shooting. The same dispute exists here. Until the details surrounding Redrick's alleged movements at the time of the shooting are resolved by a jury, Turnure cannot demonstrate that he is entitled to qualified immunity.

For these same reasons, Redrick's state law claims also survive summary judgment. The heart of each claim centers upon the same disputed facts set forth above and must be resolved by a jury.

B. Pruiett

There are undoubtedly aspects of Pruiett's excessive force claim that directly overlap with the Court's analysis of Redrick's claims. For example, there is no evidence that Pruiett ever heard any of the commands allegedly issued by Turnure. As such, Turnure cannot demonstrate, at this stage of the litigation, any active resistance by Pruiett. Similarly, given the dispute over whether Turnure ever identified himself, there remains a question of fact surrounding the alleged crime Pruiett is to have committed. Without Turnure identifying himself as a police officer, Pruiett could

---

³ Turnure's attempt to cast doubt on this holding in *Sherrod* is unavailing. Turnure is correct that other cases have found that the use of deadly force was valid without a firearm being aimed at an officer. However, *Sherrod* and the case it cites, *King,* do not make such a finding a prerequisite to the use of deadly force. Rather, it simply requires a "movement, gesture or verbal statement." In other words, a defendant must do *something* more than simply lawfully possess a firearm. Here, when the facts are viewed in a light most favorable to Redrick, he did not engage in that *something* more.

have reasonably believed that shots were being fired at him and his brother by a member of the opposing group. At that point, Pruiett would have been permitted to lawfully return fire in defense of himself and others. As a result, it cannot simply be said that Pruiett engaged in felonious conduct by firing the firearm – or threatening to – at Turnure.

However, unlike Redrick's shooting, there can be dispute that there was an immediacy attached to Pruiett's shooting. When Turnure opened fire at Pruiett, it was immediately after Pruiett had lunged to the ground to grab the firearm that had fallen from Redrick's grasp. While Pruiett contends that he did not then aim the firearm at Turnure, it was entirely reasonable for Turnure to assume that Pruiett dove for the firearm with every intent to use it. As such, there was an immediate threat.

Upon reviewing the totality of the circumstances, the Court finds that the existing genuine issues of material fact on the issues leading to Pruiett's shooting preclude summary judgment. It would be a somewhat remarkable result for a jury to conclude that Redrick's shooting was an excessive use of force and for this Court to have concluded that Turnure could rely on that excessive use of force to justify Pruiett's shooting. In other words, the jury's resolution of the disputed facts surrounding Redrick's shooting will serve to determine the reasonableness of the shooting of Pruiett as well as the two events are inextricably intertwined. Pruiett's claims, therefore, must also be considered by a jury.

**IV. Conclusion**

Defendants' motion for summary judgment DENIED. Consistent with Plaintiffs' pleadings, all remaining claims against Defendants Okoh and Lietke are hereby dismissed. The remaining claims shall be heard be a jury. A telephone status conference for counsel only is hereby

scheduled for January 7, 2021 at 3:00 p.m. Plaintiffs' counsel shall provide the Court a call-in number to utilize for the conference.

       IT IS SO ORDERED.


Date: December 13, 2020                                    */s/ John R Adams*
                                                                                        JOHN R. ADAMS
                                                                                        U.S. DISTRICT JUDGE